# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| **MISTY RUSSELL,** *on behalf of* **J.F.,** | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CAUSE NO. 1:11-CV-00388 ) |
| **MICHAEL J. ASTRUE,** **Commissioner of Social Security,** | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Misty Russell, on behalf of her minor son J.F., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Russell applied on J.F.'s behalf for SSI in September 2007, alleging disability as of January 1, 2005. (Tr. 123-25.) The Commissioner denied the application initially and upon reconsideration. (Tr. 68-75.) A hearing was held on June 17, 2010, before Administrative Law Judge ("ALJ") John Pope, at which Russell, who appeared *pro se*, and another witness testified. (Tr. 36-65.) On July 22, 2010, the ALJ rendered an unfavorable decision to Russell, concluding that J.F. was not disabled. (Tr. 20-31.) The Appeals Council denied her request for review, at

---

[1] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

which point the ALJ's decision became the final decision of the Commissioner. (Tr. 4-6.)

Russell filed a complaint with this Court on November 14, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) She advances just one terse argument in this appeal—that the ALJ improperly discounted the credibility of her testimony concerning the severity of J.F.'s behavioral limitations. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 11-12.)

## II. FACTUAL BACKGROUND[2]

J.F. was six years old when Russell applied for SSI on his behalf. (Tr. 123.) She alleges that he is disabled due to Attention Deficit Hyperactivity Disorder ("ADHD"). (Opening Br. 2.)

### A. Russell's Testimony at the Hearing

At the hearing, Russell testified that J.F., who was nine years old and in the third grade at the time, lived with her and her five other children. (Tr. 42-43.) He attends regular classes at school, with the exception of a special reading class, and has no physical limitations. (Tr. 45-47.) When asked why she thought J.F. was disabled, Russell responded that he was "really immature for his age" and was "constantly yelling and screaming and crying." (Tr. 46-47.) He was taking 54 mg of Concerta and 10 mg of Zoloft to help control his behavior, as well as a medication to help him sleep. (Tr. 47-49.)

On a typical day, Russell wakes J.F., gives him his medications, picks out his clothes, and makes sure he showers and brushes his teeth. (Tr. 49-50.) He fights with his siblings for about an hour until his medications take effect. (Tr. 51.) Once calmer, he plays a video game and then goes outside to swim in the pool; if urged, he helps pick up around the house, takes out

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 404-page administrative record necessary to the decision.

the trash, and can make a sandwich. (Tr. 52-53, 55.) He has one good friend that he spends a lot of time with, but he often conflicts with other children. (Tr. 58.) Russell testified that J.F.'s medications wear off by late afternoon and he then cries and fights with his siblings. (Tr. 54.) He used to be involved with the Boys and Girls Club but it "kicked [him] out permanently" because of his disruptive behavior, which included throwing balls from a pool table at other children.[3] (Tr. 56, 59.)

## B. *Summary of the Relevant Medical Evidence*

In June 2005, Dr. William Fedoriw prescribed 5 mg of Ritalin for J.F.; the following month he prescribed Adderall. (Tr. 269.) He continued the Adderall in September, even though Russell told him that the Adderall did not seem to work all of the time and occasionally made J.F. more aggressive or mean. (Tr. 270.)

In January 2006, J.F. was on Ritalin; Russell expressed concern to Dr. Fedoriw that the medication wears off during the day and then J.F. becomes very angry and active, swearing and throwing things. (Tr. 271.) In May 2006, J.F. was on 27 mg of Concerta; Russell again complained that the medicine wears off toward the end of the day and then J.F. stays up all night and is destructive. (Tr. 271.) In October, Russell asked Dr. Fedoriw to increase the Concerta dosage, as J.F. was very fidgety, impulsive, and unable to sit still at school; he also was not sleeping properly. (Tr. 272.)

In January 2007, Russell again asked Dr. Fedoriw to increase the Concerta dosage, complaining that it wears off by early afternoon. (Tr. 273.) By September, however, Russell

---

[3] A friend of Russell's, Marin Smith, also testified at the hearing and essentially corroborated Russell's testimony. (Tr. 61-64.) Smith stated that J.F. has "problems relating to other children his age" and that when upset, he screams and cries and "completely goes to the deep end." (Tr. 62.)

3

requested that Dr. Fedoriw lower J.F.'s Concerta dosage. (Tr. 274.) Several months later, Russell asked Dr. Fedoriw to further reduce the dosage. (Tr. 252.)

On November 12, 2007, J.F. underwent a consultative psychological evaluation by Dr. Revathi Bingi. (Tr. 236-39.) J.F. was sociable and friendly, and he easily followed directions; he demonstrated good communication, although his speech was difficult to understand at times. (Tr. 236, 239.) Russell complained that J.F.'s medications seem to wear off "early" and that he is a different person without them in that he cannot focus, breaks things, yells, kicks, and screams. (Tr. 236.) J.F.'s teacher reported that he is a good student and has potential, but that he is difficult to control without medication. (Tr. 236-37.)

Even though Dr. Bingi's mental status exam took place after 3:00 p.m., J.F.'s judgment, insight, and ability to concentrate, attend, and complete tasks were good, other than he occasionally became distracted by the lava lamp in the office. (Tr. 237.) He could do three digits forward and two digits backward; he counted from one to twelve without mistakes in ten seconds. (Tr. 237.) His full scale IQ was in the low average range (84); he scored in the average range in processing speed (94), but in the low average range in verbal comprehension (87), perceptual reasoning (86); and working memory (83). (Tr. 239.) As to daily living activities, he reportedly was very good with cleaning his room, brushing his teeth, and bathing; he could make sandwiches, but did not use a microwave. (Tr. 239.) He needed help with picking out clothes and doing chores, such as taking out the trash and making a bowl of cereal, and had to be reminded about hygiene and to "be nice." (Tr. 237.) Dr. Bingi thought that he appeared to be doing age-appropriate activities. (Tr. 239.) Dr. Bingi diagnosed ADHD and assigned a Global

Assessment of Functioning ("GAF") score of 59.[4] (Tr. 239.)

In December 2007, William A. Shipley, a state agency psychologist, reviewed J.F.'s record and found that he did not meet or equal a listing. (Tr. 245-46.) More particularly, Dr. Shipley opined that J.F. had "no limitations" in the domains of acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for self, and health and physical well-being, and "less than marked" limitations in attending and completing tasks. (Tr. 247.) Dr. Shipley noted that J.F. was able to attend and complete tasks with medication. (Tr. 247.) Dr. Steven Roush, a state agency physician, and F. Kladder, Ph.D., a state agency psychologist, reviewed J.F.'s record in March 2008 and reached the same conclusions as Dr. Shipley. (Tr. 280.)

On August 28, 2008, J.F. was evaluated at the Bowen Center. (Tr. 284-87.) Russell reported that J.F. easily gets angry, argumentative, and impulsive and that he did better when on 54 mg of Concerta than the current dosage of 36 mg. (Tr. 284.) On mental status exam, J.F. was fidgety and slow to respond to questions, but his mood was "happy"; his affect was variable with some agitation. (Tr. 284.) His insight and judgment were "questionable" and his proverb interpretation "concrete"; his intellect appeared low average to borderline. (Tr. 286.) He was diagnosed with ADHD, combined type, and oppositional defiant disorder, and assigned a GAF of 50-55. (Tr. 286.)

In September 2009, J.F. underwent a diagnostic evaluation at Park Center. (Tr. 361-68.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

He had moderate behavioral problems at school and was distractible, impulsive, inattentive, and hyperactive; he had difficulty with problem solving and decision making. (Tr. 362.) He had engaged in some self-injurious and criminal behavior, and there was evidence of defiance and anger-management problems. (Tr. 364.) Yet, he demonstrated good hygiene skills and had no difficulty with cooking and cleaning; he was able to manage time and finances. (Tr. 364.) He was diagnosed with ADHD, destructive behavior disorder, and parent-child relational problem, and assigned a current GAF of 51. (Tr. 364.)

Two months later, Catherine Duchovic of Park Center performed a diagnostic evaluation. (Tr. 364.) Russell told Ms. Duchovic that J.F. had been expelled from the Boys and Girls Club after-school program for making rude gestures, cursing staff, and acting disrespectful. (Tr. 364.) On mental status exam, J.F. was overactive, immature, distractible, depressed, and angry; he exhibited poor judgment and minimal insight. (Tr. 380-81.) He demonstrated rigid thinking and blaming and helpless thought content, but had normal memory and no homicidal thoughts. (Tr. 380-81.) He was diagnosed with ADHD, depressive disorder, disruptive behavior disorder, and parent-child relational problem, and assigned a current GAF of 51. (Tr. 383.)

A treatment plan in December 2009 reiterated J.F.'s previous diagnoses and GAF score. (Tr. 328.) He had made some improvement in school behaviors, but continued to have difficulty at home, which lacked structure and boundaries. (Tr. 328.) A March 2010 treatment plan again reflected the same diagnoses and GAF score; it further indicated that J.F.'s ability to get along with peers had improved, but that his behavior was not consistent between home and school. (Tr. 338.) The clinician documented difficulty with in-home sessions "due to family stress." (Tr. 338.) Russell and J.F. attended five counseling sessions in April and three in May; at one

session J.F. reported that he had been suspended for bringing a pocketknife to school. (Tr. 370-75.) In June, a treatment plan indicated that J.F. seemed to do well when given one-on-one attention, but that he struggles to self-direct and is easily frustrated; he also demonstrates poor judgment (Tr. 344); he reported breaking a window with his head because he was angry (Tr. 403).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. The Law

To be disabled for purposes of SSI benefits, a child "must have a 'physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Brindisi ex rel Brindisi*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)). The Social Security Administration has adopted a three-step process for determining whether a child is disabled. *Id.*; 20 C.F.R. § 416.924.

"First, if the child is engaged in substantial gainful activity, his or her claim is denied." *Brindisi*, 315 F.3d at 785 (citing 20 C.F.R. § 416.924(a)). "Second, if the child does not have a medically determinable 'severe' impairment or combination of impairments, then his or her claim is denied." *Id.* (citing 20 C.F.R. § 416.924(a)). "Finally, for a child to be considered disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment . . . ." *Id.* (citing 20 C.F.R. § 416.924(a)). "To find an impairment functionally equivalent to a listing, an ALJ must analyze its severity in [six] age-appropriate categories and find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Id.* (citing 20 C.F.R. § 416.926a(a)).

### B. The ALJ's Decision

On July 22, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 20-31.) He found at step one of the three-step analysis that J.F. was a "school-age child" and had not engaged in substantial gainful activity after the SSI application date. (Tr. 23.) At step two, the ALJ concluded that J.F.'s ADHD was a severe

8

impairment. (Tr. 23.) The ALJ determined at step three, however, that J.F.'s impairment or combination of impairments were not severe enough to meet or equal a listing. (Tr. 23-31.) Accordingly, his claim for SSI was denied. (Tr. 31.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed

In her sole argument in this appeal, Russell contends that the ALJ improperly discounted the credibility of her testimony concerning the severity of J.F.'s behavioral limitations. Contrary to her assertion, the ALJ's credibility determination is amply supported.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, when assessing Russell's credibility, the ALJ concluded that her testimony "does support the allegations that the claimant experiences some limitations as a result of his impairment, but is generally inconsistent with allegations of total disability." (Tr. 24.) In reaching this conclusion, the ALJ relied upon J.F.'s daily living activities, course of treatment, the objective medical evidence, and a perceived inconsistency between the reports from J.F.'s

9

school and home. (Tr. 24-25.)

In her terse argument challenging the ALJ's credibility determination, Russell first complains that the ALJ's credibility determination is vague in that it "does not explain what 'total disability' is." (Opening Br. 12.) But Russell's undeveloped argument is unavailing, as the ALJ adequately articulated his reasoning for discounting her credibility.

To explain, the ALJ first considered that despite J.F.'s behavioral problems, he was in regular classes at school; dresses, grooms, and bathes himself and performs household chores if prompted; plays video games, watches movies, and swims and plays outside; and has at least one good friend. (Tr. 24.) He also noted that J.F. had recently started participating in a summer sports academy and a library reading program. (Tr. 24.) The ALJ then concluded that J.F. had no limitation in the ability to care for himself and "less than marked" limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 25-30.) Accordingly, the ALJ's conclusion that J.F.'s ADHD causes him "some" limitations but not enough for a finding of disability is easily traced. *See Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily living activities as a factor when discounting claimant's credibility); 20 C.F.R. § 416.929(c)(3); SSR 96-7p; *see generally Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).

The ALJ also considered that none of the medical source opinions of record assigned J.F. limitations in excess of those reflected in the RFC. (Tr. 25.) Of course, "[i]t is axiomatic that the

claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *see Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 416.912(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

In addition, the ALJ emphasized that although Russell complained of the severity of J.F.'s behavioral symptoms and that his medications wore off in the afternoon, the medical record reflects that on two separate occasions Russell requested that J.F.'s medication dosage actually be reduced. (Tr. 25.) The ALJ reasonably inferred that Russell perceived an improvement in J.F.'s condition at the time she made these requests, *see Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him), undercutting her testimony of disabling behavioral outbursts. The ALJ also noted the Bowen Center's comment that J.F. does not always receive his medication when staying with his father. (Tr. 285.) The ALJ is entitled to consider the type of treatment that a claimant has undergone when determining the credibility of a claimant's subjective complaints. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009); *see Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 416.929(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p.

11

And finally, the ALJ discounted Russell's testimony about the severity of J.F.'s behavioral limitations because, as both Dr. Bingi and Park Center observed, the reports from J.F.'s school were inconsistent with his reported behavior at home. (Tr. 24-25; *see* Tr. 158, 239, 338.) Specifically, the record reflects that J.F.'s behavioral problems were more pronounced at home than at school, undercutting Russell's assertion that J.F.'s ADHD is of disabling severity. Russell argues, however, that the ALJ inappropriately "cherry-picked" the record when discounting her credibility on this basis, asserting that he ignored evidence in the record that indicates J.F.'s medications wear off in the afternoon, which explains the inconsistency between the school reports and her testimony. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (emphasizing that an ALJ is not permitted to "cherry-pick" from mixed medical results to support a denial of benefits).

Of course, the ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997). Rather, the ALJ is required to account for "all medical evidence that is credible, *supported by clinical findings*, and relevant to the question at hand." *Id*. (emphasis added). Here, the evidence that Russell points to merely reflects her subjective report to certain medical providers that she thought J.F.'s medications wear off later in the day, *not* a medical source's opinion that the medications do, in fact, wear off. (*See* Tr. 270-73.) This evidence, without objective clinical findings, does not rise to the level of an entire "line of evidence" that the ALJ ignored when discounting her credibility. *See, e.g., White v. Shalala*, No. 93 C 3080, 1994 WL 445449, at *15 (N.D. Ill. Aug. 12, 1994) (concluding that the ALJ did not ignore an entire line of evidence concerning claimant's purported need to take frequent naps where the supporting evidence was limited to claimant's

subjective statements to medical providers, rather than any objective medical evidence); *see generally Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (stating that an ALJ may discount a physician's opinion that is based solely on the claimant's subjective complaints). In any event, even if discounting Russell's credibility on this final basis was "a bit harsh," *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008), "an ALJ's credibility assessment will stand as long as there is some support in the record." *Id.* (citation and internal quotation marks omitted). Here, the other reasons provided by the ALJ amply support the ALJ's assessment of Russell's credibility.

In sum, the ALJ adequately considered the credibility of Russell's testimony about J.F.'s behavioral symptoms in accordance with the factors identified in 20 C.F.R. § 416.929(c), and his conclusion that they cause him "some limitations" but not enough for a finding of disability is easily traced and is not "patently wrong." *Powers*, 207 F.3d at 435; *see Books*, 91 F.3d at 980. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Russell.

SO ORDERED.

Enter for this 22nd day of January, 2013.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge
